Jamie S. Kilberg, OSB No. 110465
jamie@kauffmankilberg.com
KAUFFMAN KILBERG LLC
1050 SW Sixth Avenue, Suite 1414
Portland, OR  97204
Telephone:  (503) 224-2595
Facsimile:  (503) 224-3203

Attorneys for Defendant Carlos Manuel Perez-Lopez

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:24-cr-00391-IM-1 |
| Plaintiff, | DEFENDANT'S SENTENCING MEMORANDUM |
| v. | Sentencing Date: July 9, 2026 |
| CARLOS MANUEL PEREZ-LOPEZ, | Time: 10:00 a.m. |
| Defendant. | |

Defendant Carlos Manuel Perez-Lopez, by and through his attorney Jamie S. Kilberg, hereby files this Sentencing Memorandum.  On July 9, 2026, Mr. Perez-Lopez will be sentenced following his guilty plea to a one-count Superseding Information, charging him with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B) and 846. Mr. Perez-Lopez respectfully requests the Court sentence him to a term of 96-months' imprisonment, followed by a four-year term of supervised release.

Page 1   -   DEFENDANT'S SENTENCING MEMORANDUM

## I.    INTRODUCTION

Carlos Perez-Lopez grew up in Mexico surrounded by poverty, where he sacrificed his education so that he and his family could eat—working in the fields with his father at a young age and dropping out of school around the fourth grade.  He grew up dreaming of coming to the United States to make a better life for himself and his family.  At 22, he came to the U.S., staying for four years before returning home.  His reunion with his family in Mexico was short-lived, however.  Wanting to escape intrafamily violence that he had been witnessing since childhood led him to return to the U.S. once again, settling in the Pacific Northwest.  Mr. Perez-Lopez was a hard worker, working various labor jobs, until a fight at a restaurant in 2016 landed him in prison.

His world fell apart while he was in prison.  The woman he loved left him, leaving him to transition back into the community alone.  A medical issue led to surgery, complications, an infection, and a lengthy hospital stay.  Returning home alone after recovering, Mr. Perez-Lopez found himself once again alone, struggling with his recovery, wanting to provide financially for his family back home in Mexico, and primed to make a series of poor choices that have landed him in this Court.  Specifically, although not a significant abuser of drugs himself (though enough of a user that he believes programming will help him continue to abstain from both drugs and alcohol, PSR ¶ 74), Mr. Perez-Lopez discovered an easy way to make money by helping one of his co-defendants with drug distribution.  His role included conducting mid-level sales with a person who turned out to be a confidential informant, and picking up a large load of drugs from a truck stop for delivery to a co-defendant in Portland.

For his role in this conspiracy, Mr. Perez-Lopez expressed an early desire to take responsibility.  While the advisory Guidelines would suggest that the weight of the drugs he was

sent to pick up merit a sentence in the 10-year range, such a sentence is more than necessary here. Instead, given all the facts and circumstances, a 96-month sentence is the appropriate sentence.

## II.    ADVISORY GUIDELINES AND PRE-SENTENCE INVESTIGATION REPORT

There are no objections to the calculation of the advisory Guidelines set forth in the Presentence Report ("PSR"). Undersigned counsel did raise two (belated) overlooked requested edits to the draft PSR. The requests relate to (1) deleting reference to an uncharged 2019 allegation under an alleged alias that occurred in another state while Mr. Perez-Lopez was serving an Oregon state sentence, and (2) deleting unnecessary language in one paragraph that could have unintended collateral consequences for Mr. Perez-Lopez while in custody. Counsel is in communication with the U.S. Probation Office to hopefully resolve those requests in advance of sentencing.

The parties and the PSR agree the following Guidelines apply:

| | |
|---|---|
| 2D1.1(a)(5), (c)(2) – base offense level | 36 |
| 3E1.1 – reduction for acceptance of responsibility | -3 |
| TOTAL OFFENSE LEVEL | 33 |

Mr. Perez-Lopez further agrees that he has three criminal history points and is therefore a criminal history category II, resulting in an advisory Guidelines range of 151-188 months' imprisonment. The government has further agreed to recommend an additional two-level reduction pursuant to 18 U.S.C. § 3553(a), to reflect Mr. Perez-Lopez's early expression of his "intent to resolve this complex case, and [his] agreeing to forgo filing any motions or needlessly delay in the proceedings." PSR ¶ 15. This lowers the advisory Guidelines range to 121-151

months.  Under the terms of the plea agreement, Mr. Perez-Lopez is free to argue as low as 96 months, while the government must come up with some articulable reason why his conduct would merit a near-top-of-the-range sentence of up to 144 months.  PSR ¶ 10.  No such rationale exists.  The PSR concurs and recommends the Court impose a term of 97 months, largely in line with Mr. Perez-Lopez's recommendation.

## III.    A 96-MONTH SENTENCE IS SUFFICIENT

Although Mr. Perez-Lopez does not know what sentence the government will ultimately recommend, under the terms of the plea agreement, it may recommend as much as 144 months.  Given that the government agrees that the modified advisory range, after considering Mr. Perez-Lopez's early expression of a desire to resolve this case,[1] is 121-151 months, it must believe there is some rationale to justify a near-top-of-the-range sentence.  There is none.  Mr. Perez-Lopez was a mid-level distributor in a much larger conspiracy involving players and defendants wholly unknown to him.  After reviewing all the information and evidence in this case, the Probation Office has thoughtfully recommended a 97-month sentence.  Mr. Perez-Lopez largely agrees and requests the Court sentence him to a term of 96-months' imprisonment.

### A.    The Sentence Must Be No Greater Than Necessary to Achieve the Goals of Sentencing

Under the parsimony principle in Section 3553, Congress has instructed the courts that they "shall impose a sentence sufficient, but not greater than necessary, to comply with the four

---

[1] Mr. Perez-Lopez was initially charged by Criminal Complaint dated September 14, 2024, along with the two individuals with whom he engaged in the relevant drug transaction. *See* ECF No. 9.  He was later indicted in a single-defendant indictment on October 9, 2024.  *See* ECF No. 20.  A Superseding Indictment was returned on November 20, 2024, naming a total of 11 defendants.  *See* ECF No. 119.  As early as February 3, 2025, immediately after the Court accepted Mr. Perez-Lopez's waiver of arraignment on the Superseding Indictment (ECF No. 123), Mr. Perez-Lopez, through counsel, communicated to the government that he was prepared to accept responsibility for his role in this offense and resolve the case.

identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017); 18 U.S.C. § 3553(a).  Even sentences within the advisory Guidelines range can be "greater than necessary" to serve the objectives of sentencing.  *Kimbrough v. United States*, 552 U.S. 85, 111 (2007) (finding that district court's below-Guidelines sentence not unreasonable because "it appropriately framed its final determination in line with § 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary to accomplish the goals' of sentencing").  While the sentencing courts "'must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process,'" *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016), the district judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) (*per curiam*) (Guidelines are "not to be *presumed* reasonable").

In this case, as detailed below, a 96-month sentence is adequate to achieve the goals of sentencing.

> **B.      The Modified Advisory Guidelines Range Is Not Empirically Based and Is Too Harsh Under the Facts Here**

The methamphetamine Guideline—and as a result, the advisory Guidelines range calculated for Mr. Perez-Lopez—is excessively harsh and bears little correlation to the kind of empirically based sentences the Guidelines are supposed to provide.  *See Gall*, 552 U.S. at 46-47 n.2 (noting that "the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes"); *United States v. Cabrera*, 567 F. Supp. 2d 271, 276 (D. Mass. 2008) (imposing sentence 65% below Guidelines

Page 5   -   DEFENDANT'S SENTENCING MEMORANDUM

range in drug distribution case; observing that "the Sentencing Commission has never explained how drug quantity is meant to measure offense seriousness, and significantly, how it correlates with the purposes of sentencing under 18 U.S.C. § 3553(a)"; and criticizing Sentencing Commission for presuming "that drug quantity is somehow a proxy for culpability").

As the Court knows, the drug guidelines are driven entirely by weight, with an underlying assumption that weight is somehow a good proxy for overall culpability. While there may be some anecdotal appeal to such a conclusion, it is not the one-size-fits-all application that the Guidelines attempt to portray. For example, here, all parties acknowledge that Mr. Perez-Lopez, despite his placement as defendant number 1, was not the primary target of the government's investigation and is a mid-level distributor. He became the "lead" defendant merely by happenstance as he was one of the first individuals arrested and charged in this conspiracy after law enforcement intercepted the drugs here.

Mr. Perez-Lopez concedes he participated in several drug transactions involving the government's confidential informant, and he drove to Aurora, Oregon, to pick up the large quantity that resulted in his arrest. But he was also a pawn. An important pawn, yes, and perhaps even a trusted pawn—but a pawn nonetheless. The drugs he sold the confidential informant came from a co-defendant. *See, e.g.*, ECF No. 253 (government sentencing memorandum for defendant Freddy Bish) at 3 ("Hugo Roman Aparicio (Roman) was the target of a DEA wiretap investigation."). That defendant apparently was supplied by yet another bulk narcotics-distributing co-defendant. *See, e.g.*, ECF No. 281 (plea agreement for defendant Jose Malfavon Lopez) at 3 ("Malfavon had agreed to provide Roman five pounds of methamphetamine with the understanding that Roman would pay Malfavon for the drugs after Roman had sold the drugs to others."). Mr. Perez-Lopez was sent to the truck stop in Aurora,

Page 6   -   DEFENDANT'S SENTENCING MEMORANDUM

Oregon, to pick up the load at issue here.  He did not touch the drugs.  He was told where to go and to allow the men at the truck stop to load up his vehicle and drive it back to Portland.  Which is exactly what he did.  Other than co-defendant Hugo Roman Aparicio—who was alleged to have supplied the drugs Mr. Perez-Lopez had previously sold to the confidential informant— there is no evidence Mr. Perez-Lopez had any contact with any of his other co-defendants.  And he is not alleged to have had any role in the manufacturing, packaging, importing, transporting, or arranging the distribution of the methamphetamine.

The weight of the drugs others placed in his vehicle is not a good proxy for Mr. Perez-Lopez's overall culpability.  But the base offense level here is driven entirely by that weight, over which he had no say and no control.  Sentencing Mr. Perez-Lopez closely in line with the attendant drug Guidelines—even as reduced by the government's agreement regarding Mr. Perez-Lopez's early indication of a desire to resolve the case—would result in an excessive sentence.  *See, e.g.*, *United States v. Jaber*, 362 F. Supp. 2d 365, 382 (D. Mass. 2005) (sentencing defendant in drug conspiracy case who was facing a Guideline sentence of 57 months to probation, in part because the defendant "was [merely] a functionary" who "took orders from" his codefendant, and because the amount of drugs "that passed through his hands reflects someone else's decisions, not his own").  Mr. Perez-Lopez does not argue that he is without significant blame or fault; that is why he agreed to plead guilty even with the prospect of spending many years in prison.  But the degree is not in line with what the advisory Guidelines would suggest.

C.    **Mr. Perez-Lopez's History and Characteristics Warrant a 96-Month Sentence**

Section 3553(a)(1) requires the Court to consider "the history and characteristics of the defendant." Factoring in Mr. Perez-Lopez's history and background, a sentence of 96 months is appropriate.

Mr. Perez-Lopez grew up in a loving home in Mexico. But it was an impoverished existence. His father, who is 76 years old, worked in agriculture his whole life. His mother, who is 70 years old, was a homemaker. Both suffer from significant medical issues now and do not work. PSR ¶ 58. He was also exposed to intense violence—not from or between his parents, but his maternal uncles around him were incredibly violent with each other, PSR ¶ 60, to the point that he reported that they eventually killed each other off. Mr. Perez-Lopez had to witness that violence as a young boy, which continued into his adulthood.

Ever since he was a little boy, Mr. Perez-Lopez worked. He only went to school when he had time and, as a result, only got through about fourth grade. To this day, he struggles with reading and writing. PSR ¶ 75. He had to work as a way to feed himself—even as a child. Schooling was sacrificed to ensure he had something to eat. PSR ¶ 59. He recalled hunger was a frequent issue, and that his family's economic condition led to "a lot of suffering." *Id.*

The economic hardships he and his family endured in Mexico led Mr. Perez-Lopez to want to come to the United States when he was about 22 years old. He remained and worked in the United States for about four years before returning to Mexico. PSR ¶ 64. After only two years back home, however, he felt compelled to return to the U.S. once again to escape the intrafamily violence he was continuing to witness. Initially, he came to Vancouver, Washington, before moving to San Jose, California, for about four years. He came back to the Pacific Northwest, where he has remained. *Id.* During that time, he was productive, working in labor

Page 8    -    DEFENDANT'S SENTENCING MEMORANDUM

jobs, including installing granite and carpeting, janitorial services, painting, landscaping, and wildfire fighting.  PSR ¶ 76.

In 2016 in Beaverton, Oregon, Mr. Perez-Lopez got into a fight at a restaurant where he brandished and used a knife to cause injury to another person.  He pleaded guilty to second-degree assault and was sentenced to 70-months' imprisonment under Oregon's Ballot Measure 11 law.  PSR ¶ 47.  At the time of his conviction, Mr. Perez-Lopez had been in a five-year stable relationship with a woman named Maria (last name omitted for privacy).  Unfortunately, by the time Mr. Perez-Lopez was released from custody, Maria had decided to move on.  He could not even figure out how to contact her.  The break-up was very hard on Mr. Perez-Lopez.  He returned to Beaverton, feeling "devastated," which led to extreme feelings of isolation.  PSR ¶ 65.  The isolation worsened in 2022 when he had to have surgery to remove a kidney stone.  "During the surgery, doctors made a mistake which required the defendant to return to the hospital.  He was hospitalized for a 'long period of time' due to an infection in his lungs."  PSR ¶ 67.  Upon his release, Mr. Perez-Lopez "had no one to take care of him"; he was "alone in his new apartment," sometimes "unable to get out of bed."  PSR ¶ 65.  Mr. Perez-Lopez believes this series of events—the loss of a long-term and meaningful relationship, isolation, surgery, complications, and a stressful recovery period—"played a role in what led him to engage in the conduct of conviction."  *Id.*

The losses, along with the need for belonging and companionship—and the need to continue to provide money for his family back home in Mexico—led directly to Mr. Perez-Lopez making the ill-fated choice to get involved in supporting his co-defendant's drug trafficking operation.  Mr. Perez-Lopez does not excuse nor try to justify his conduct; he made that choice, and he has consistently indicated both to counsel and the government (through counsel) his

Page 9   -   DEFENDANT'S SENTENCING MEMORANDUM

willingness to accept responsibility for his actions. However, a sentence in accordance with the initial advisory Guidelines range, as calculated in the PSR, is excessive under these circumstances—as even the Probation Office recognizes. Any argument by the government for a substantially lengthier sentence cannot be justified by the facts.

> **D.      The Court Should Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Put another way, "similar conduct should be punished in a somewhat similar manner." *Cullen v. United States*, 194 F.3d 401, 408 (2d Cir. 1999). Sentencing Mr. Perez-Lopez to the recommended 96-month term (or Probation's 97-month recommended term) is appropriate when comparing Mr. Perez-Lopez to others in this conspiracy.

To date, the Court has sentenced four co-defendants, and four others await sentencing, including at least two who will be making joint recommendations with the government.

Luis Perez Romo was convicted of a drug trafficking conspiracy, in violation of 21 U.S.C. § 841(b)(1)(A). He was alleged to be a courier for a co-defendant, who had over 27 kilograms of methamphetamine in his vehicle. The Court sentenced him to 18-months' incarceration. ECF No. 189. Mr. Perez-Lopez recognizes that Mr. Perez-Romo's case was substantially different. Mr. Perez-Romo received credit for being a minimal participant, received a safety-valve adjustment, and received a zero-point offender adjustment, among others. Mr. Perez-Lopez does not suggest his case is comparable to Mr. Perez-Romo, as reflected in the defense recommended sentence that is more than five times longer. But if the government ends up recommending 144 months—a sentence that is *eight* times longer than Mr. Perez-Romo's,

Page 10  -   DEFENDANT'S SENTENCING MEMORANDUM

who was convicted of a 10-year mandatory-minimum offense—that would constitute an unwarranted disparity.

Yunis Falla Moreno was also convicted of a drug trafficking conspiracy, in violation of 21 U.S.C. § 841(b)(1)(A). He was alleged to be involved in the same transaction as Mr. Perez-Romo above (that is, involving more than 27 kilograms of methamphetamine). The Court sentenced Mr. Moreno to 51-months' incarceration. *See* ECF No. 206. Again, Mr. Perez-Lopez recognizes clear differences between his case and Mr. Moreno's, including Mr. Moreno qualifying for the safety valve and the zero-point offender adjustment, among other things. But again, that is why Mr. Perez-Lopez is recommending a sentence that is nearly twice as long as Mr. Moreno's—an appropriate difference, not the nearly three times difference the government is authorized to seek under the plea agreement.

Arasmel Campos Gonzalez was also convicted of a drug trafficking conspiracy, in violation of 21 U.S.C. § 841(b)(1)(A). He was alleged to be a bulk distributor and supplier for another co-defendant. He was caught with nearly 12 kilograms of methamphetamine, nearly a kilogram of cocaine, 768 grams of heroin, and 165 grams of fentanyl. The Court sentenced Mr. Campos-Gonzalez to 48-months' incarceration, based in part on the parties' joint recommendation. *See* ECF No. 259. Like Mr. Moreno, Mr. Campos-Gonzalez benefitted from the safety valve and being a zero-point offender. Mr. Perez-Lopez's recommended 96-month sentence is an appropriate disparity for the similar conduct of being a bulk distributor.

Freddy Bish fulfilled a different role in the conspiracy; he was convicted of conspiracy to traffic firearms—specifically, to transport firearms from the United States to Mexico, potentially as part of ongoing drug cartel violence. The Court sentenced him to 50-months' incarceration based in part on the parties' joint recommendation. *See* ECF No. 268.

Page 11  -   DEFENDANT'S SENTENCING MEMORANDUM

Three of the four co-defendants pending sentencing are, perhaps, the most relevant to Mr. Perez-Lopez, even though the Court has not sentenced them.

Julian Sagrero Guantes pleaded guilty to a drug trafficking conspiracy, in violation of 21 U.S.C. § 841(b)(1)(A). He was a bulk drug supplier. Like Mr. Campos-Gonzalez, he was caught with nearly 12 kilograms of methamphetamine, nearly a kilogram of cocaine, 768 grams of heroin, and 165 grams of fentanyl. Under the terms of his plea agreement, his Guidelines range likely called for at least a 121-month sentence. *See* ECF No. 256. The parties are jointly going to recommend an 87-month sentence. *Id.* Mr. Sagrero-Guantes does not qualify for the safety valve and is not a zero-point offender, but Mr. Perez-Lopez recognizes there may be other factors that distinguish him. But not to the tune of a sentence that is potentially five years longer.

Jose Malfavon Lopez pleaded guilty to a drug trafficking conspiracy, in violation of 21 U.S.C. § 841(b)(1)(A). He admitted to being Mr. Roman-Aparicio's supplier (who in turn supplied Mr. Perez-Lopez). Mr. Malfavon-Lopez also pleaded to a § 851 enhancement for having a prior serious drug offense. Notwithstanding that that would mean a mandatory minimum of 180 months, he will face a maximum government recommendation of 168 months at sentencing. *See* ECF No. 281. Mr. Perez-Lopez was at least two rungs down the ladder from Mr. Malfavon-Lopez. The government cannot articulate a factual basis for why Mr. Perez-Lopez's case should be treated similarly to Mr. Malfavon-Lopez. Instead, a 96-month sentence for Mr. Perez-Lopez appropriately accounts for the differences in their roles and other factors.

Finally, Hugo Roman Aparicio, who directed and supplied Mr. Perez-Lopez, was the target of the government's drug investigation. Still, he has pleaded guilty only to trafficking firearms. *See* ECF No. 261. While it is not clear what his likely sentence will be, undersigned counsel estimates his Guidelines exposure to be approximately 87 months.

Page 12  -   DEFENDANT'S SENTENCING MEMORANDUM

The sentences and expected sentences of the co-defendants in this case aptly show why a 96-month sentence is appropriate. It is also worth noting that the approximately 20 kilograms of methamphetamine and 820 grams of fentanyl that Mr. Perez-Lopez picked up from the truck stop in Aurora, Oregon, represented only a small portion of the total amount of drugs in that load. Enrique Salcedo Duron and Erick Martinez Solorio—the truck drivers who placed the drugs in Mr. Perez-Lopez's vehicle at the truck stop—were transporting *another* 100 kilograms of methamphetamine they had picked up in California and were on their way to the Midwest to deliver. PSR ¶¶ 27, 29-30. Mr. Martinez-Solorio was convicted of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(b)(1)(A), and was sentenced to 33-months' incarceration. *See* Case No. 3:24-cr-00392-AB, ECF No. 56. Mr. Salcedo-Duron is pending trial. The requested 96-month sentence for Mr. Perez-Lopez is appropriate.

**E.      Other Factors Warrant a Time-Served Sentence**

There are other factors that, when taken together and with the factors described above, warrant a time-served sentence.

1.      Mr. Perez-Lopez faces significant collateral consequences. As an alien with no status, upon completion of his sentence, he will be removed from the United States, where he had lived and worked for several years prior to this case, and sent back to Mexico, away from his 12-year-old daughter in Vancouver, Washington. Deportation is a "drastic measure" and a "particularly severe penalty," even as Mr. Perez-Lopez is looking forward to reuniting with his parents, provided their health sustains them through his incarceration. *Sessions v Dimaya*, 138 S. Ct. 1204, 1213 (2018) (quoting *Jordan v. De George*, 341 U.S. 223, 231 (1951) and *Jae Lee v. United States*, 582 U.S. 357, 370 (2017)). The Supreme Court has recognized that "deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be

imposed on noncitizen defendants who plead guilty to specified crimes." *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010). For that reason, courts have recognized the legitimacy of considering imminent removal as a proper basis for imposing a below-guidelines sentence. *See, e.g.*, *United States v. Thavaraja*, 740 F.3d 253, 256, 262-63 (2d Cir. 2014) (affirming sentence of more than 50% below Guidelines range and rejecting government's argument that immigration consequences should not be considered by a sentencing judge in determining what sentence is sufficient but not greater than necessary).

2.      As an alien without status, Mr. Perez-Lopez faces harsher conditions of confinement. He will be unable to take advantage of early home or community confinement or earn his way toward a minimum-security designation. *United States v. Davoudi*, 172 F.3d 1130 (9th Cir. 1999) (holding district court had discretion to depart downward because deportable alien may be unable to take advantage of minimum security designation or the up-to-six-months of home confinement authorized by 18 U.S.C. § 3624(c)); *United States v. Farouil*, 124 F.3d 838 (7th Cir. 1997) (holding district court may consider whether defendant's status as deportable alien would result in unusual or exceptional hardship in conditions of confinement that might warrant a departure, including ineligibility for home detention, community confinement, work release, intermittent incarceration, or minimum security designation).

3.      As an alien without status for whom removal upon release is imminent, the sentencing goals of providing rehabilitation and protecting the public carry reduced weight. *United States v. Biheiri*, 356 F. Supp. 2d 589, 603 (E.D. Va. 2005) (imposing 13-month sentence for defendant convicted of false statements, and declining to depart upward for alleged ties to terrorism financing in part because defendant "will be deported to Egypt immediately following

Page 14  -   DEFENDANT'S SENTENCING MEMORANDUM

his release from confinement, [and] the goals of protecting the public and providing rehabilitative opportunities are of little import in the instant circumstances").

## IV.    CONCLUSION

For the foregoing reasons, Mr. Perez-Lopez respectfully requests that the Court sentence him to a period of 96-months' imprisonment, impose a term of four years of supervised release, waive all fines, and impose a mandatory special assessment of $100.

DATED:  July 1, 2026.

KAUFFMAN KILBERG LLC


 /s Jamie S. Kilberg
JAMIE S. KILBERG
OSB No. 110465
Telephone:  (503) 224-2595

Attorneys for Carlos Manuel Perez Lopez